United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Securities and Exchange Commission, Plaintiff, <br><br> v. <br><br> John W. Fisher, Defendant. | ) ) ) ) ) ) ) ) Civil Action No. 21-60624-Civ-Scola |

**<u>Order Granting Motion for Final Judgment</u>**

The Securities and Exchange Commission initiated this action, charging Defendant John W. Fisher with violating Sections 5(a) and (c) of the Securities Act of 1933 and Section 15(a)(1) of the Securities Exchange Act of 1934. (Compl., ECF No. 1.) Through its complaint, the Commission sought a permanent injunction, disgorgement with prejudgment interest, and a civil penalty. Following discovery and a December 2021 mediation, Fisher, without admitting or denying the allegations in the complaint, consented to an injunction against future violations of the two securities statutes. (Pl.'s Inj. Mot., Ex. B, Def.'s Consent, ECF No. 27-2.) Thereafter, the Court entered the parties' agreed upon judgment. (Inj. Order, ECF No. 29.) The Commission now seeks disgorgement of $277,806 of the commissions Fisher received, $43,365 in prejudgment interest on that disgorgement, and a $50,000 civil penalty. (Pl.'s Mot., ECF No. 32.) Fisher opposes the motion, arguing (1) he should be required to pay only $50,013 in disgorgement, with a concomitant reduction in the interest amount; and (2) no financial penalty should be assessed. (Def.'s Resp., ECF No. 35.) The Commission has replied (Pl.'s Reply, ECF No. 36) to Fisher's response. The Commission's reply prompted Fisher to file an amended declaration (Def.'s Not., ECF No. 39), to which the Commission, with Court permission, responded (Pl.'s Resp. to Decl., ECF No. 42). After careful consideration of the briefing, the record, and the relevant legal authorities, the Court **grants** the Commission's motion (**ECF No. 32**).

1. **Background**[1]

1 Global Capital, LLC, a South Florida company, was in the business of funding merchant cash advances which are short-term loans to small and

---

[1] Under the terms of Fisher's consent and the judgment, Fisher has agreed that he is precluded from arguing that he did not violate the securities laws as alleged in the complaint, and further that for purposes of the Commission's motion, the allegations of the complaint are accepted as and deemed true. (Inj. Order at § II.) The facts that follow are drawn solely from the complaint. Other facts or evidence raised by the parties in briefing will be addressed in the Court's analysis of the Commission's motion.

medium-sized businesses. (Compl. ¶¶ 1, 10.) 1 Global promoted its offerings as providing these businesses with an alternative source of funding to traditional bank loans or other financing methods. (*Id.* ¶ 10.) 1 Global also claimed, in the marketing materials it gave its sales agents—Fisher among them—that it collected an average of $1.30 to $1.40 on each dollar it advanced to the merchants. (*Id.* ¶ 13.) In reality, however, 1 Global and its chairman and chief executive officer, Carl Ruderman, were operating a fraud, using much of the investor funds they solicited for purposes other than making merchant cash advances. (*Id.* ¶¶ 3, 17.) Indeed, 1 Global and Ruderman syphoned off millions of "investor" funds to support Ruderman's luxurious lifestyle and operate unrelated businesses. (*Id.* ¶¶ 3, 17.) These expenditures included money to fund a family vacation to Greece, monthly payments for a Mercedes Benz, monthly American Express credit card payments, payments for Ruderman's household staff, $4 million to his family trust, and $1 million to one of his sons to invest in cryptocurrency. (*Id.* ¶ 17.)

In order to shield this reality from its investors, 1 Global sent investors monthly account statements purporting to show each investor's account, credited with what were really non-existent interest payments. (*Id.* ¶¶ 14, 16.) Each account statement also claimed, falsely, that an independent audit firm had reviewed and agreed with 1 Global's rate-of-return formula. (*Id.* ¶ 20.) Unsurprisingly, 1 Global did not register its securities offering with the Commission, and there was no applicable exemption from such registration. (*Id.* ¶ 4.) From 2014 until July 2018, when 1 Global filed for bankruptcy, 1 Global and Ruderman fraudulently raised at least $320 million from the sale of unregistered securities to more than 3,600 investors nationwide. (*Id.* ¶ 3, 10.)

To generate investments, 1 Global recruited a network of dozens of external, mostly unregistered, sales agents, including Fisher. (*Id.* ¶ 21.) Fisher, residing in Sacramento, California, was, from August 2016 to March 2018, associated with an investment adviser firm that was registered in California and Hawaii. (*Id.* ¶ 6.) In March 2018 Fisher formed Fisher-Caulkins Wealth Management, Inc., also an investment adviser firm, registered in California. Fisher was additionally state licensed to sell insurance and annuity products and held a Series 65 securities license, as well. (*Id.*)

In March 2017, Fisher signed a sales agreement with 1 Global which would pay him a four-percent commission on all direct sales, plus additional percentages for renewals and for the sales of any other agents he recruited. (*Id.* ¶ 21.) Fisher traveled to South Florida, in April 2017, and spent two days meeting with various 1 Global officers, managers, and employees to discuss 1 Global's business. (*Id.* ¶ 22.) During this trip, a 1 Global attorney told Fisher that 1 Global had, at one point, sold a one-year note but then changed to a nine-month

note so as not to be subject to Commission registration requirements. (*Id.*) 1 Global representatives also told Fisher that its financial statements were audited. (*Id.*) To support his sales efforts, 1 Global regularly provided sales materials to Fisher that he used in marketing the investments. (*Id.* ¶ 23.) These materials touted 1 Global's self-described high returns, averaging between "high single digit" and "low double digit" annual returns. (*Id.*) Further, the monthly investor account statement that 1 Global sent to Fisher, and other sales agents, showed that the accounts consistently provided returns ranging from eight to seventeen percent a year. (*Id.*)

To sell the 1 Global securities, Fisher solicited his existing advisory clients, insurance product customers, and others. (*Id.* ¶ 24.) His efforts, touting the merits of the investment, were effected through email, during dinner seminars, and via telephone, among other channels. (*Id.*) At dinner seminars, Fisher told his prospective investors that 1 Global's securities were short-term alternatives to the main product line he sold to them—fixed index annuities. (*Id.*) In Fisher's risk disclosure forms, he characterized the 1 Global investment as low risk. (*Id.* ¶ 25.) At the same time, Fisher had some customers execute a risk disclosure form that said the merchant cash advances were not "securities or investment products." (*Id.*) During the time he offered and sold 1 Global's products, Fisher was not registered as a broker-dealer with the Commission nor was he associated with a registered broker-dealer. (*Id.* ¶¶ 4, 28.)

Among the red flags about the offering that Fisher disregarded was a statement in a 1 Global document that investors signed, when making their investments, that said the use of investors' funds was within 1 Global's sole discretion. (*Id.* ¶ 26.) This was directly at odds with the company's representations that the investor funds were secured by the merchant cash advances. (*Id.*) 1 Global also never provided Fisher with any audited financial statements despite his requests to see them. (*Id.* ¶ 27.) And, despite receiving copies of all his clients' monthly statements that contained statements about the independent auditor, Fisher never spoke to anyone at the firm named to verify that it was indeed 1 Global's "independent auditor" or that it approved 1 Global's formula for determining rates of return. (*Id.*)

Based upon his sales of 1 Global's product, Fisher earned more than $329,000 in transaction-based sales commissions, selling about $8.5 million in transactions to at least 80 investors. (*Id.* ¶ 28.)

The Commission filed its two-count complaint, seeking injunctive relief along with disgorgement, prejudgment interest, and civil penalties, based upon Fisher's violations of the Securities and Exchange Acts. Following discovery and mediation, in December 2021, without admitting or denying the allegations of the complaint, Fisher consented to an injunction judgment against future

violations of the of the Securities Act. Under the consent and judgment, which the Court entered in January 2022, Fisher agrees that he is precluded from arguing that he did not violate the securities laws as alleged in the complaint and that, further, for purposes of the Commission's motion for final judgment, the allegations of the complaint are accepted as true. (Inj. Order at 3.) Additionally, the parties have also agreed that the Court may determine the issues raised in this motion on the basis of affidavits, declarations, excerpts of sworn testimony, and documentary evidence, without regard to the standards for summary judgment contained in Federal Rule of Civil Procedure 56(c). (*Id.*)

## 2. Analysis

### A. Disgorgement

The Commission submits it is entitled to $277,806 in disgorgement from Fisher, representing the $329,031 he received in commissions, minus $51,225 which he paid to a colleague for her sales efforts. (Pl.'s Mot. at 14.) In response, Fisher argues, on the one hand, that disgorgement in this case is not warranted because *1 Global* defrauded the investors, not Fisher. (Def.'s Resp. at 8–9.) On the other hand, says Fisher, to the extent the Court finds disgorgement applicable, he urges the Court to apply other deductions, aside from the amounts paid to his colleague, amounting to $227,793, resulting in a disgorgement amount of only $50,013. (Def.'s Resp. at 9–10.) The Court finds Fisher's position unworkable and unsupported.

The federal securities laws provide for disgorgement of wrongdoers' net profits. 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."); *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020) ("[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)."). Under long-standing United States Supreme Court precedent, "[i]n order to be entitled to disgorgement, the SEC needs to produce only a reasonable approximation of the defendant's ill-gotten gains, and exactitude is not a requirement." *SEC. v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014) (cleaned up); *see also United States Commodity Futures Trading Comm'n v. Tayeh*, 848 F. App'x 827, 828 (11th Cir. 2021) (recognizing the Government's "burden to produce a reasonable approximation of a defendant's ill-gotten gains to sustain a disgorgement amount").

Upon the Commission's production of a reasonable approximation of ill-gotten gains, "the burden then shifts to the defendant to demonstrate that the [Government's] estimate is not a reasonable approximation." *Tayeh*, 848 F. App'x

at 828 (cleaned up). Similarly, if the Commission's "measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).

Fisher's first point, that disgorgement is not warranted here, is meritless. Indeed, he cites no legal authority supporting his position, contending that disgorgement is simply "not necessary" to punish Fisher because, as he claims, he himself did not engage in any fraud. But disgorgement is directed at wrongdoers, generally, regardless of whether their securities violations are characterized as fraud or not.

Fisher's second point is also flawed. He catalogs additional amounts—what he terms additional legitimate business expenses that were attributable to his 1 Global transactions—that he says should be deducted: $661.31 spent to visit 1 Global headquarters in April 2017; $22,427.04 for dinner seminars, marketing to prospective investors; and $227,793 in general business and administrative expenses for operating his business while he sold the 1 Global investments. (Def.'s Resp. at 9–10.) By Fisher's math, he says his total disgorgement amount, deducting these additional expenses, should only be $50,013. The court disagrees.

Where expenses "arguably have value independent of fueling a fraudulent scheme," they may be deducted from a disgorgement amount. *Liu*, 140 S. Ct. at 1950. Conversely, "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *Tayeh*, 848 F. App'x at 829. Assuming Fisher properly established that the travel and dinner-seminar costs that he tallies were indeed used to further Fisher's 1 Global sales efforts, such expenses are nonetheless, not deductible. Fisher's travel to 1 Global's headquarters and the extravagant dinner seminars in which he purportedly indulged all served to perpetuate the wrongful conduct in this case and simply added to Fisher's ill-gotten gains. Any funds spent in furtherance of drawing in more victims to 1 Global's fraud are not, by any stretch of the imagination, legitimate business expenses. *SEC v. Navellier & Assocs., Inc.*, No. 17-CV-11633-DJC, 2021 WL 5072975, at *6–7 (D. Mass. Sept. 21, 2021) (denying deductions where the defendants' "expenditures on sales and marketing amplified the harm caused"); *see also SEC v. Owings Grp., LLC*, No. CV RDB-18-2046, 2021 WL 1909606, at *4 (D. Md. May 12, 2021), *aff'd sub nom. SEC v. Johnson*, 43 F.4th 382 (4th Cir. 2022) (recognizing that expense are

not legitimate business expenses when they are used to solicit more investors into the scheme).[2]

The same reasoning can be applied to the $227,793 in general business and administrative expenses Fisher seeks to deduct: Fisher himself acknowledges that this amount was "attributable to generating [his] 1 Global commissions." (Def.'s Resp. at 10.) Additionally, however, many of the expenses Fisher lists appear to be fixed costs that would be the same whether Fisher sold the 1 Global product or not: rent, utilities, insurance, administrative expenses. Further, Fisher supplies no evidence that his payroll costs increased as a result of his 1 Global involvement. And, finally, Fisher's attempt to recoup expenses such as client gifts, professional fees, dues and subscriptions, and charitable contributions are thoroughly meritless as well.

In sum, the Court finds a disgorgement award of $277,806 to be a reasonable approximation of Fisher's ill-gotten gains and further concludes that Fisher has failed to show that the estimate is not reasonable.

### B. Prejudgment Interest

The Commission also seeks prejudgment interest on the disgorgement amount. Fisher does not dispute the propriety of an award of prejudgment interest but, instead, simply says the amount of interest should be recalculated based on a disgorgement amount of $50,013, rather than $277,806. Because the Court has concluded that $277,806 in disgorgement is appropriate in this case, it agrees with the SEC's determination that Fisher must pay $43,365 in prejudgment interest.

### C. Civil Penalty

The Commission also seeks to impose a civil penalty of $50,000 against Fisher, both to punish him for his conduct and to deter others who would harm investors. Fisher resists the application of a penalty, casting himself as a victim of 1 Global's deception and characterizing his errant conduct as "only" regulatory violations. (Def.'s Resp. 4–5.) He also portrays himself as something of a hero, hiring counsel to help his clients recover their lost investments through the claims process. (*Id.* at 5.) Further, Fisher minimizes his clients' losses, pointing out that none of them has lost their "entire retirement savings" and that he only recommended the 1 Global product to clients who could "withstand the loss." (*Id.*) Lastly, Fisher maintains that nearly all the factors courts consider

---

[2] The SEC has generously agreed to deduct amounts Fisher paid to a "colleague for her sales efforts." (Pl.'s Mot. at 14.) Because the parties do not dispute the deduction, the Court declines to pass on whether this is reasonably considered a legitimate business expense.

when imposing penalties militate in his favor. While the Court has some sympathy for Fisher, based on the position he has put himself in, Fisher's presentation, on the whole, is far from compelling and, in some respects, concerning.

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *Monterosso*, 756 F.3d at 1338 (11th Cir. 2014). The Acts authorize three tiers of civil monetary penalties against violators: the first tier applies when there is any violation of the Acts; the second applies to violations that involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and the third is triggered by any violation satisfying a second-tier criterion that additionally "resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* (cleaned up). Fisher does not dispute that the first tier applies to his violations. He also does not dispute that, for first-tier violations, during the relevant period, the penalty assessed may not exceed the greater of: (i) a $10,360 penalty for an individual defendant for each violation of the securities laws; or (ii) the gross pecuniary gain to the individual defendant as a result of the violation. 15 U.S.C. § 77t(2)(A); 17 C.F.R. § 201.1001; *see also* Def.'s Mot. at 17–18. Various courts have interpreted "each violation" to mean that each violative transaction can count as a discrete violation. *See, e.g.*, *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013) (finding "no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation"); *SEC v. Milan Capital Grp., Inc.*, No. 00 Civ. 108(DLC), 2001 WL 921169, *3 (S.D.N.Y. Aug. 14, 2001) (imposing a penalty for each of 200 defrauded investors). Since Fisher's earned commissions arose out of transactions with at least 80 investors (Compl. ¶ 28), this would result in an outer assessment, based on "each violation," of, at minimum, $828,800 ($10,360 multiplied by 80). Or, simply taking into account the Court's determination of Fisher's gross pecuniary gain, a penalty of as much as $277,806 could also be assessed.

Ultimately, determining the amount to be imposed, within the outer bounds described above, is left to the district court's discretion. *Monterosso*, 756 F.3d at 1338. In applying that discretion, courts have looked to the following general factors to guide their decisions:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would

>otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Huff*, 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010), *aff'd,* 455 F. App'x 882 (11th Cir. 2012). The Court disagrees with Fisher that all but the sixth factor weighs in favor of not assessing any penalty at all.

As to the first factor, egregiousness, the Court finds a lack of candidness in Fisher's attempt to minimize his wrongdoing. He maintains that his "only interest was to provide certain clients with the opportunity to invest in products other than annuities." (Def.'s Resp. at 6.) This protestation is belied by the record. The unrebutted evidence presented shows that Fisher unreservedly violated his obligations as a licensed securities professional to conduct thorough due diligence on 1 Global before offering the company's purported investment vehicle to his clients. He repeatedly expressed his glee regarding how easy the investments were to sell and his excitement about the extra income. Fisher began lining up his clients to buy the 1 Global notes before he had even spoken to anyone at the company or undertaken even a modicum of research. He failed to undertake the most basic investigations into 1 Global's legal and financial statements, never verified 1 Global's purported audits, and turned a blind eye to numerous red flags, as he continued to tout and sell the product. Fisher's persistent attempts to minimize his wrongdoing only serve to exacerbate the egregiousness factor.

Next, in the face of mountains of evidence and Fisher's acceptance of the allegations in the complaint as true, the Court finds Fisher exhibited a degree of recklessness that satisfies the scienter, or second, factor. And, indeed, Fisher does not dispute that he acted "with reckless disregard for whether [his] conduct violated the law." (Def.'s Resp. at 6.) Instead he maintains, simply, that he had not intended to violate the law. This factor, then, certainly tips, although not tremendously so, in favor of a not-insubstantial penalty.

The third factor certainly weighs in favor of a meaningful penalty as well: Fisher sold the 1 Global notes to 80 investors over the course of fifteen months, violating the law each time he convinced one of his clients to invest 1 Global's fraud. Fisher's characterization of his wrongdoing as "a single mistake made at the time of the initial sale," only magnifies, again, his unwillingness to accept responsibility for his misconduct which, in turn, satisfies the Court that the fourth factor—a failure to admit wrongdoing—also weighs in favor of a substantial penalty.

Fisher also attempts to deflect on the fifth factor as well, insisting that his client's losses were really only attributable to 1 Global's fraud, rather than his own wrongdoing, once again refusing to accept responsibility for his role in the scheme.

While the parties seem to agree that the sixth factor—regarding Fisher's cooperation and honesty with authorities—is neutral, they diverge again as to the seventh factor—the appropriateness of the penalty in light of Fisher's own financial situation. While the SEC deems this factor neutral, Fisher complains that the imposition of any penalty "would have a substantial effect on Mr. Fisher's current and future financial condition." (Def.'s Resp. at 7.) In support, he points to his advanced years—being now eighty years old—and that "due to various life events, he has little in liquid assets." (*Id.*) While the Court is sympathetic to the sentiment, Fisher's presentation nonetheless rings hollow. Although he says the combined total of all his bank and brokerage accounts amounts to only $119,491 and that he owes $350,000 on his mortgage, at the same time he acknowledges having "some home equity" and an annuity of $302,360. Notably, Fisher doesn't reveal whether there are any other assets (such as his operating business), *how much* equity he has in his house, or what his income currently is from the business he continues to operate. He also doesn't specify what the "life events" are that apparently resulted in his current financial situation. For example, were they debilitating illnesses or some other tragedies? Or did those events entail the purchase of luxury cars and expensive vacations and meals? Without more information, the Court is hard pressed to find any way to apply this factor in Fisher's favor.

In sum, after carefully reviewing the record, considering the parties' briefing, and weighing the factors listed above, the Court finds levying a civil penalty of $50,000 against Fisher warranted in this case. Not only is such a penalty well below either calculation of the maximum penalty the Court could award, but it is also, as Fisher does not dispute, not inconsistent with other penalties that have been assessed against other 1 Global sales agents for similar misconduct. *SEC v. Henry J. Wieniewitz*, Case No. 19-cv-61738 (S.D. Fla. Aug. 14, 2019) (Dimitrouleas, J.) ($150,000 penalty on commissions of $3.5 million for 1 Global and Woodbridge); *SEC v. Christopher D. Dantin*, Case No. 21-cv-60588 (S.D. Fla. March 17, 2021) (Dimitrouleas, J.) ($100,000 penalty on $1,279,000 in commissions minus expenses); *SEC v. Roger Dobrovodsky*, Case No. 20-cv-62561 (S.D. Fla. Dec. 15, 2020) (Singhal, J.) ($50,000 penalty on commissions of $317,690); *SEC v. Chris A. Dantin*, Case No. 21-cv-60588 (S.D. Fla. March 17, 2021) (Dimitrouleas, J.) ($30,000 penalty on $22,817 in commissions minus expenses); *SEC v. Roy Gagaza*, Case No. 21-cv-61030 (S.D. Fla. May 18, 2021) (Altman, J.) ($30,000 penalty on $157,993 in disgorgement of portion of commissions); *SEC v. David Ortiz*, Case No. 21-cv-60590 (S.D. Fla. August 9, 2021) (Altman, J.) ($30,000 penalty on $149,986 in commissions); *SEC v. Robert Todd Seth*, Case No. 20-cv-62563 (S.D. Fla. May 3, 2021) (Smith, J.) ($30,000 penalty on $238,245 in commissions minus expenses); *SEC v.*

*Andrew White*, Case No. 21-cv-60589 (S.D. Fla. March 19, 2021) (Singhal, J.) ($30,000 on $129,672 in commissions minus expenses); and *SEC v. Matthew L. Walker*, Case No. 20-cv-62564 (S.D. Fla. December 21, 2021) (Singhal, J.) ($15,000 penalty on no disgorgement).

### 3. Conclusion

As set forth above, the Court **grants** the Commission's motion in its entirety (**ECF No. 32**), finding Fisher liable to the Commission for **$277,806** in disgorgement, representing his net profits gained as a result of the alleged conduct, prejudgment interest on the disgorgement of **$43,365**, and a civil penalty of **$50,000**. A separate final judgment will follow.

The Clerk is directed to **close** this case. Any pending motions are denied as moot.

**Done and ordered** at Miami, Florida, on October 21, 2022.

_____
Robert N. Scola, Jr.
United States District Judge